## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

**MICHAEL P.**                                            **CASE NO.  2:17-CV-00764**

**VERSUS**                                                **JUDGE JAMES D. CAIN, JR.**

**BLUE CROSS AND BLUE SHIELD OF**                          **MAGISTRATE JUDGE HANNA**
**TEXAS, ET AL.**

## MEMORANDUM RULING

Before the court are memoranda filed by plaintiff Michael P. and defendants Blue
Cross & Blue Shield of Texas; Energy Transfer Partners GP, L.P.; and Energy Transfer
Partners GP, L.P. Health & Welfare Program for Active Employees. The memoranda are
filed under the court's ERISA case order and relate to plaintiff's challenge to a denial of
benefits under an ERISA plan.

## I.
### BACKGROUND

This suit arises from the denial of coverage for acute inpatient mental health services
for plaintiff's daughter, M.P. Defendants provided coverage for eleven days of inpatient
treatment and then determined that further inpatient services were not medically necessary,
though M.P. continued to treat as an inpatient. Plaintiff appealed the denial of benefits
through internal and external review procedures with the claim administrator. He now files
suit in this court, alleging that the denial of benefits was an abuse of the claim
administrator's discretion.

### A. *The ERISA Plan*

At all times relevant to this matter, plaintiff was employed by Energy Transfer Partners GP, L.P. Because of this employment, plaintiff and M.P. were insured under the Energy Transfer Partners Health and Welfare Program for Active Employees ("the plan"), a self-funded employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* doc. 31, att. 1. Blue Cross Blue Shield of Texas ("BCBSTX") acts as claim administrator for the plan and has authority to interpret plan terms and determine benefits. Doc. 38, att. 1, p. 75 (BCBSTX0074).

Medical services are only covered under the plan if they are "Medically Necessary as determined by the Claim Administrator." *Id.* at 16 (BCBSTX0015). The plan sets forth criteria for defining medically necessary services. *Id.* at 62 (BCBSTX 0061). It also provides that the medical staff of the claim administrator will determine medical necessity under the plan. *Id.*

### B. *The Challenged Decision*

M.P., who was eighteen at the time of the challenged decision, has a long history of suicide attempts and hospital stays through her later teen years. Doc. 44, att. 1, pp. 304–10 (BCBSTX3871–77). She was admitted to the Menninger Clinic ("Menninger") in Houston, Texas, on January 26, 2016, for inpatient mental health treatment. Doc. 42, att. 2, pp. 108–19 (BCBSTX0280–91). Her admission to Menninger followed two suicide attempts in the preceding month. *Id.* at 18, 108–19 (BCBSTX0190, BCBSTX0280–91); *see* doc. 43, att. 9, p. 264 (BCBSTX3196).

-2-

BCBSTX used the Milliman Care Guidelines ("MCG" or "Guidelines") to evaluate medical necessity of M.P.'s treatment. *See, e.g.*, doc. 43, att. 5, pp. 253–54 (BCBSTX2048–49). Under these guidelines BCBSTX authorized inpatient treatment from January 26 through January 31, and then authorized five more days of inpatient treatment through February 5, 2016. Doc. 44, att. 7, pp. 16, 19 (BCBSTX4900, BCBSTX4903). On February 8, 2016, Menninger requested that BCBSTX authorize an additional four days of inpatient treatment – from February 6 through February 10, 2016. Doc. 42, att. 2, pp. 108–09 (BCBSTX0280–81). After a review conducted by BCBSTX medical director Dr. Thomas Krajewski, encompassing medical records and consultation with M.P.'s treating psychiatrist at Menninger, BCBSTX denied the requested services as no longer medically necessary. *Id.* Plaintiff received notice of this determination but M.P. continued to receive treatment from Menninger's inpatient program through March 21, 2016. *See* doc. 42, att. 1, pp. 2–4 (BCBSTX0088–90); doc. 44, att. 7, pp. 3–20 (BCBSTX4887–4904). M.P. then treated as an intensive outpatient at Westend Hospital in Jennings, Louisiana, from April 17 through May 31, 2016. Doc. 44, att. 1, p. 310 (BCBSTX3877); doc. 45, att. 7, p. 280 (BCBSTX7888). There is no apparent dispute as to coverage for her treatment at that facility. Plaintiff states that, as of April 2020, M.P. has not made another suicide attempt since her discharge from Menninger. Doc. 146, p. 8.

### C. Appeals Process

Menninger appealed BCBSTX's denial of coverage on April 11, 2016. Doc. 43, att. 9, p. 66 (BCBSTX2998). The appeal was handled by BCBSTX medical director Dr. Timothy Stock. Doc. 42, att. 2, pp. 104–06 (BCBSTX0276–78). Dr. Stock reviewed M.P.'s

medical records and affirmed the decision on May 9, 2016. *Id.* BCBSTX then received an internal appeal from plaintiff on July 11, 2016. *See* doc. 44, att. 7, pp. 2–3 (BCBSTX4886–87). In connection with this appeal, another review was conducted by BCBSTX medical director Dr. Thomas Allen. *Id.* Dr. Allen also affirmed the determination based on his consideration of M.P.'s medical records. *Id.*

On July 24, 2016, plaintiff requested an independent external review ("IER"). Doc. 44, att. 10, pp. 17–20 (BCBSTX5804–07). In support of this request he submitted letters from M.P.'s treating providers at Menninger and Westend, who supported the necessity of M.P.'s extended treatment at Menninger. Doc. 45, att. 6, pp. 63–64 (BCBSTX7361–62); doc. 45, att. 7, p. 274 (BCBSTX7882). On August 16, 2016, Dr. Stock conducted a pre-IER review, reaffirmed the coverage determination, and submitted M.P.'s claim to an independent review organization. *See* doc. 42, att. 2, pp. 9–10 (BCBSTX0181–82). Dr. Ragy Girgis, a psychiatrist employed by the independent review organization, reviewed the claim file and issued a decision on September 16, 2016. *Id.* at 16–20 (BCBSTX0188–92). He partially overturned the denial, finding that five additional days of inpatient treatment – from February 6 to February 10, 2016 – should have been authorized as medically necessary but that coverage for the remaining thirty-nine days (until March 21, 2016) was appropriately denied. *Id.*

### D. District Court Suit

Plaintiff then filed suit in the Fourteenth Judicial District Court, Calcasieu Parish, Louisiana, seeking a reversal of BCBSTX's coverage decision for those thirty-nine days of inpatient treatment. Doc. 1, att. 1. BCBSTX removed the suit to this court based on

federal question jurisdiction and diversity of citizenship. On the former basis, BCBSTX noted that plaintiff's claims arise under ERISA, 29 U.S.C. § 1001 *et seq.*, because plaintiff is attempting to recover benefits and enforce rights under an employee welfare plan governed by that statute. Doc. 1. Plaintiff agrees that ERISA governs this matter and that an abuse of discretion standard applies to the court's review of BCBSTX's decisions. Doc. 115; *see* doc. 128, att. 1, p. 21. Under the court's ERISA case order [doc. 106], the parties have lodged the administrative record for this matter. *See* doc. 119. They have also filed their memoranda relating to the plaintiff's challenge. Docs. 128, 138, 146, 150. Accordingly, the matter is now ripe for review.

## II.
### STANDARD OF REVIEW

When a claim is governed by ERISA, the district court serves an appellate role to the appeal of the plan administrator's decision. *McCorkle v. Met. Life Ins. Co.*, 757 F.3d 452, 456 (5th Cir. 2014). Accordingly, the court's latitude "is very narrowly restricted" by ERISA regulations and case law. *Id.* Its review of factual issues is generally limited to the evidence before the administrator at the time he rendered his decision. *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 299 (5th Cir. 1999), *abrogated on other grounds by Met. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). Where the plan vests the administrator with discretionary authority to determine eligibility for benefits and interpret and enforce the provisions of the plan, the court's standard of review is for abuse of discretion. *White v. Life Ins. Co. of N. Am.*, 892 F.3d 762, 767 (5th Cir. 2018). This is the "functional equivalent of arbitrary and capricious review." *Conn. Gen. Life Ins. Co. v. Humble Surg. Hosp., LLC*,

878 F.3d 478, 483 (5th Cir. 2017) (internal quotations omitted). The plaintiff bears the burden of showing that an abuse of discretion was committed. *E.g.*, *Dowden v. Blue Cross & Blue Shield of Tex., Inc.*, 126 F.3d 641, 644 (5th Cir. 1997).

"A plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial." *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 246 (5th Cir. 2009) (internal quotations omitted). Where the administrator's decision is supported by substantial evidence and is not arbitrary and capricious, it must be upheld. *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004). "Substantial evidence" amounts to "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 512 (5th Cir. 2010). The decision will only be found arbitrary if there is no "rational connection" between the known facts and the decision, or between the facts found and the evidence. *Holland*, 576 F.3d at 246–47. The court's review "need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness—even if on the low end." *Vega*, 188 F.3d at 297.

### III.
### APPLICATION

At issue in this matter is whether BCBSTX abused its discretion by determining that M.P. did not qualify for continuing inpatient mental health treatment at Menninger past February 10, 2016. To this end plaintiff alleges that BCBSTX (1) failed to consider or even obtain relevant medical records; (2) applied incorrect or inapposite guidelines; and (3)

applied those guidelines in an arbitrary and capricious manner. Doc. 128, att. 1. BCBSTX maintains that its decision was made based on the appropriate guidelines and records, and that its denial of benefits is supported by substantial evidence within the record. Doc. 138, att. 1. It also asserts that plaintiff is not entitled to some of the remedies sought. *Id.*

### A. *Completeness of Record*

Plaintiff challenges the denial based on the scope of records reviewed by BCBSTX's medical reviewers and the IER reviewer. Doc. 128, att. 1, pp. 42–44. Specifically, he asserts that these reviewers failed to obtain all relevant that plaintiff listed in the release he provided with his appeal.[1] He further argues that only limited weight should be given to the reviewers' opinions, because none of them examined M.P. firsthand and because Doctors Stock, Allen, and Girgis (who handled the internal appeals and external review, respectively) did not contact her treatment providers to discuss M.P.'s condition.

The administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Vercher v. Alexander & Alexander, Inc.*, 379 F.3d 222, 233 (5th Cir. 2004) (internal quotations omitted). Still, the administrator is not required to give the treating physician's opinion special weight over conflicting reliable evidence. *Id.* Claim administrators may reasonably rely on the opinions of doctors who have reviewed the claimant's medical files, even if they have not examined the claimant or consulted with his treating physicians. *Davis v. Unum Life Ins. Co. of Am.*,

---

[1] Plaintiff also argues that these records should be made part of the administrative record. Doc. 119. The court will only review these records, which were not before the plan administrator at the time the challenged benefits determinations were made, if it decides that BCBSTX committed a procedural error in failing to obtain them.

444 F.3d 569, 577 (7th Cir. 2006). Reliance may be unreasonable, however, when the expert conducting the review has not evaluated the patient but makes credibility determinations regarding her medical history and symptomology. *Evans v. UnumProvidentCorp.*, 434 F.3d 866, 878 (6th Cir. 2006).

In this matter the first reviewer did consult with plaintiff's treating psychiatrist. Plaintiff argues that the subsequent reviewers' "refusal to even try to contact [the] treating providers is . . . indicative of arbitrary decision-making" and that the scope of their review limits the weight it should be accorded. Doc. 128, att. 1, pp. 43–44. The court will consider this omission with regard to any credibility determinations or assumptions, but does not find it sufficient to make the entire process unworthy of deference.

As for the scope, plaintiff alleges that the reviewers erred by failing to obtain and consider all relevant information to the claims and appeals. Specifically, he points out that he listed Westend Hospital, Lake Charles Memorial Hospital, Longleaf Hospital, and Women & Children's Hospital (now Lake Area Medical Center) as providers with documents relevant to the claims and provided a release for these providers.

An administrator's failure to provide a reviewer with all relevant medical records may support a finding that the administrator abused its discretion. *Davis v. Aetna Life Ins. Co.*, 2016 WL 9448704, at *4 (N.D. Tex. May 26, 2016), *aff'd*, 699 F. App'x 287 (5th Cir. 2017). ERISA, however, imposes no duty on plan administrators to collect every medical record from every provider who has treated the patient. *Vega*, 188 F.3d at 298. Generally, the plan participant is required to submit additional relevant information to the administrator for consideration. *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 804 (10th

Cir. 2004). It thus remains incumbent on plaintiff to establish the relevance of these records, their availability, and the administrator's fault in ignoring them.[2] *Id.* at 804–06; *see also Topalian v. Hartford Life Ins. Co.*, 945 F.Supp.2d 294, 352–53 (E.D.N.Y. 2013).

Here the plan provides that a participant has the "option of presenting evidence and testimony" when appealing a denial of benefits. Doc. 31, att. 1, pp. 25–26 (BCBSTX0024–25). The appeal request form, which plaintiff completed on or about June 24, 2016, instructed him to "[a]ttach additional information, Explanation of Benefits, Notification Letter and/or medical records for the dates of service being appealed" and submit it with the form to BCBSTX's appeals section. Doc. 44, att. 1, p. 301 (BCBS3868). The next page contained a release of medical records, which was signed by M.P. on June 26, 2016, and authorized "the release to the Independent Review Organization of all necessary medical records and other documents that are relevant to the review and are in the possession of the Utilization Review Agent or any physician, hospital, or other health care provider." *Id.* at 302 (BCBSTX3869). On July 8, 2016, BCBSTX informed plaintiff that the appeal was under review and that he could expect a response in about thirty days. *Id.* at 311 (BCBSTX3878). It added that the "response may be delayed if more information is needed," and that plaintiff would be notified of "what is needed" if that happened. *Id.*

---

[2] Defendants argue that the additional records are not relevant under 29 C.F.R. § 2560.503-1(m)(8). That regulation defines a record as relevant to a benefits determination, in pertinent part, if it "was relied upon in making the benefit determination" or "was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination." *Hughes v. Hartford Life and Acc. Ins. Co.*, 368 F.Supp.3d 386, 394 (D. Conn. Mar. 25, 2019) (citing 29 C.F.R. § 2560.503-1(m)(8)(i)–(ii)) (cleaned up). The regulation's definition, however, relates to the administrator's obligation to provide the claimant with copies of relevant records – not the scope of records on which the administrator or reviewer should rely in the first place.

Plaintiff argues that these forms and correspondence led him to believe that BCBSTX would obtain records from the treatment providers he listed. He also maintains that records from M.P.'s past psychiatric providers could provide greater understanding of her subjective symptoms and her lack of responsiveness "to the 'lesser forms of treatment' the reviewers so readily concluded would be sufficient." Doc. 128, att. 1, p. 35. It is clear under the plan, however, that the participant bears the burden of submitting additional relevant information in support of his appeal. As described infra, the record already contained an account of M.P.'s history and prior treatment failures. Plaintiff does not show where or how he explained the relevance of other providers' records to a review of BCBSTX's determination for coverage of treatment at Menninger. Accordingly, he shows no abuse of discretion through the scope of BCBSTX's review.

### B. *Review of Decision*

#### 1. *Use of Milliman Care Guidelines*

Plaintiff first argues that BCBSTX "applied incorrect or inapposite guidelines" to his claim. Doc. 128, att. 1, pp. 23–27. Specifically, he maintains that the Milliman Care Guidelines ("MCG") used by BCBSTX "are overly restrictive and designed for private insurers . . . to use as a basis for denying coverage." *Id.* at 23. He further asserts that the MCG were unsuitable for the kind of non-acute, residential care M.P. was receiving at Menninger. *Id.* at 24. Finally, he argues that BCBSTX erred by applying the MCG's admissions criteria to determine whether she should be discharged. *Id.* at 29–30.

Plaintiff implies that the MCG are unreliable because they are marketed to health insurance companies. He also observes that the MCG "are notably not included in the Plan

or otherwise mentioned in the Plan's definition of 'Medical Necessity.'" *Id.* at 23. The MCG, however, appear to have sufficient support and acceptance from healthcare providers.[3] They may also be used by plan administrators, though not explicitly referenced in the plan, so long as they do not "change the definition of a term within a plan or effectively add requirements to that definition." *Weiss v. Banner Health*, 416 F.Supp.3d 1178, 1186 (D. Colo. 2019) (quoting *E.R. v. UnitedHealthcare Ins. Co.*, 248 F.Supp.3d 348, 362 (D. Conn. 2017)).

Plaintiff's main dispute with the MCG appears to be that they do not address "non-acute residential treatment levels of care," a limitation recognized by other courts. Doc 128, att. 1, pp. 23–25; *see Charles W. v. BlueShield of Or.*, 2019 WL 4736932, at *3–*6 (D. Utah Sep. 27, 2019) (citing *H.N. v. Regence BlueShield*, 2016 WL 7426496 (W.D. Wash. Dec. 23, 2016)). Menninger advertises two kinds of treatment programs: inpatient and outpatient. M.P. was admitted to the Compass program, which is advertised as a six- to eight-week inpatient program for young adults.[4] Doc. 43, att. 2, p. 11 (BCBSTX1052). However, relevant Texas licensing requirements only distinguish between inpatient and

---

[3] Hospitals generally use either the MCG or InterQual Criteria in determining whether a patient requires inpatient or outpatient care. *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 690 (6th Cir. 2017). Both systems "were developed by independent companies with no financial interest in admitting more inpatients than outpatients," and the MCG was "written and reviewed by over 100 doctors and reference 15,000 medical sources." *Id.* Accordingly, as other courts have held, a reviewer with appropriate training and expertise may reasonably consider the MCG in determining the necessity of a patient's care. *E.g., Becker v. Chrysler LLC Health Care Benefits Plan*, 2011 WL 2601254, at *6 (E.D. Wis. June 30, 2011), *aff'd*, 691 F.3d 879 (7th Cir. 2012); *Summersgill v. E.I. Dupont De Nemours & Co.*, 2016 WL 94247, at *10 (D. Mass. Jan. 6, 2016).

[4] *E.g., Treatment for Young Adults*, THE MENNINGER CLINIC, https://www.menningerclinic.org/treatment/treatment-for-young-adults (last visited March 31, 2020); *Menninger Compass Program*, THE MENNINGER CLINIC, https://www.menningerclinic.org/treatment/treatment-for-young-adults/inpatient-programs/compass-program (last visited April 15, 2020).

outpatient facilities and not between inpatient and residential treatment facilities. Tex. Health & Safety Code § 571.003(12).

Under the BCBSTX plan's terms, medically necessary mental health treatment is also covered at residential treatment centers. *See* doc. 31, att. 1, pp. 60–66 (BCBSTX0059–65). The MCG provisions at issue related to "inpatient care" and offered residential treatment as an alternative lower level of care. Doc. 38, att. 1, pp. 74–76 (BCBSTX0160–62). Plaintiff asserts that Menninger was covered as a residential treatment program and that BCBSTX abused its discretion by failing to investigate the nature of services that M.P. was receiving.

As defendants point out, however, Menninger consistently sought coverage for M.P. at an acute inpatient level of care. *See* doc. 42, att. 2, pp. 98–119. At the conclusion of M.P.'s treatment, M.P. and her family also considered discharge to a residential treatment program but ultimately opted for an intensive outpatient program instead. *See* doc. 42, att. 2, pp. 74–76 (BCBSTX0246–48). Additionally, other courts have accepted the classification of Menninger as an acute inpatient psychiatric facility and reviewed a denial of benefits under that standard. *E.g.*, *Love v. Dell, Inc.*, 551 F.3d 333, 338 (5th Cir. 2008); *Joel S. v. Cigna*, 356 F.Supp.3d 1305, 1308 (D. Utah 2018). Accordingly, plaintiff fails to show that the MCG for inpatient care were ill-suited to the claims at issue or that BCBSTX otherwise abused its discretion by allowing its reviewers to consider the guidelines. The cases cited by plaintiff based on failure to provide coverage for residential treatment likewise have no bearing on this matter.

Finally, plaintiff complains that BCBSTX reviewers erred by applying "the Admissions Guidelines, rather than the Discharge Guidelines" of the MCG. Doc. 128, att. 1, pp. 29–30. The relevant MCG provisions relate to determining necessity of admission to inpatient care. They set a goal length of stay at five days but provide that a patient may be discharged to a lower level of care sooner or later than the goal "when it is appropriate for their clinical status and care needs." Doc. 38, att. 1, p. 79 (BCBSTX0165). The section also contains provisions relating to discharge, but these only set forth the tasks that "[d]ischarge planning . . . may include[.]" *Id.* at 81 (BCBSTX0167). Accordingly, plaintiff shows no error in the criteria applied.

### 2. *Review of Decision*

Finally, the court arrives at the heart of the matter: whether BCBSTX acted arbitrarily or capriciously in determining M.P.'s inpatient treatment was not medically necessary past February 10, 2016.

### a. *Relevant plan and MCG provisions*

The plan defines a medically necessary service as one that is:

1. Essential to, consistent with, and provided for the diagnosis or the direct care and treatment of the condition, sickness, disease, injury, or bodily malfunction; and
2. Provided in accordance with and [is] consistent with generally accepted standards of practice in the United States; and
3. Not primarily for the convenience of the Participant, his Physician, Behavioral Health Practitioner, the Hospital, or the Other Provider; and
4. The most economical supplies or levels of service that are appropriate for the safe and effective treatment of the Participant. **When applied to hospitalization, this further means that the Participant requires acute care as a bed patient due to the nature of the services provided or the Participant's condition, and the Participant cannot receive safe or adequate care as an outpatient.**

-13-

Doc. 31, att. 1, p. 62 (BCBSTX0061) (emphasis added).

M.P.'s discharge records identify her principal diagnoses as Borderline Personality Disorder ("BPD") (F60.3) and "Major Depressive Disorder, recurrent severe without psychotic features" (F33.2). Doc. 43, att. 5, p. 208 (BCBSTX2003); doc. 44, att. 3, pp. 11–13, 107 (BCBSTX4055–57, BCBSTX4151). BCBSTX considered the Milliman Care Guidelines for inpatient care of Bipolar Disorder in determining the medical necessity of her treatment. *See* doc. 38, att. 1, pp. 73–82 (BCBSTX0159–68). Plaintiff does not dispute the suitability of these guidelines to M.P.'s diagnoses.

Under the relevant MCG, inpatient treatment is considered medically necessary if (1) a patient risk exists and (2) the treatment situation is appropriate at that level (i.e., the condition excludes a lower level of care). *See* doc. 38, att. 1, pp. 73–76 (BCBSTX0159–62). Relevant here, inpatient care is justified based on an imminent danger of harm to self where at least one of several listed conditions is present, including where there is "[i]mminent risk for recurrence of a suicide attempt or act of serious self harm" as evidenced by the patient's "very recent" history of suicide attempts or acts of serious self harm, and "absence of sufficient relief of the action's precipitants." *Id.* at 73–74 (BCBSTX0159–60). Additionally, inpatient care must be deemed the appropriate level for the patient's condition based on one or more conditions. These include where "voluntary treatment at a lower level [is] not feasible (eg, very short-term crisis intervention or residential care unavailable or unacceptable for patient condition)." *Id.* at 75 (BCBSTX0161).

-14-

### b.  Application

Plaintiff argues that the reviewers abused their discretion by failing to consider each element in the MCG and by misconstruing and ignoring evidence of risk at each level of decision-making. He also maintains that the IER arbitrarily selected a cut-off date of February 10, 2016. Under the standards described above, however, there is no requirement that each reviewer catalog all evidence or negate each possible theory of risk. Instead, the plaintiff must demonstrate the lack of substantial evidence supporting the plan administrator's ultimate decision.

Plaintiff's real dispute appears to be with the findings that M.P.'s condition had improved sufficiently as to her danger of suicide or self-harm by the last covered date. He argues that, based on M.P.'s history and the record of her care at Menninger, there is insufficient evidence to show that her condition no longer required inpatient care by February 11, 2016. As he notes, M.P. had multiple suicide attempts and DUIs in the year preceding admission. *See* doc. 44, att. 8, pp. 224, 230 (BCBSTX5351, BCBSTX5357); doc. 44, att. 9, pp. 254, 275–77 (BCBSTX5731, BCBSTX5752–54). Her last suicide attempt occurred just two days before her admission to Menninger, and she had had four inpatient hospitalizations for suicide attempts in the last two to three years. *E.g.*, doc. 43, att. 9, p. 264 (BCBSTX3196).

According to BCBSTX, M.P. met the MCG criteria for admission to inpatient care on January 27, 2016, and was renewed for another five days on February 1. Doc. 42, att. 2, pp. 115–18 (BCBSTX0287–90). On both dates the reviewer specifically noted, among other things, "ongoing [suicidal ideation]" after M.P.'s most recent suicide attempt and

severe symptoms as evidenced by "paranoid and [auditory hallucinations,] impaired insight, judgement [*sic*], and coping skills." *Id.* On February 8, 2016, M.P.'s treating psychiatrist (Dr. Joyce Davidson) told BCBSTX reviewer Dr. Krajewski that M.P. had "been denying [suicidal ideation] for a while now" and would "probably not meet acute criteria." *Id.* at 108 (BCBSTX0280). Accordingly, Dr. Krajewski found that inpatient care was not medically necessary past February 5 and that M.P. could "safely be treated in a lower level of care, such as [Mental Health] Outpatient[.]" *Id.* As part of the IER, however, Dr. Girgis considered a letter from Dr. Davidson endorsing the necessity of the entire length of M.P.'s inpatient treatment and explaining its benefits in light of her treatment history. Doc. 44, att. 9, p. 254 (BCBSTX5731). Specifically, Dr. Davidson noted:

> [M.P.] is an 18-year-old who presented at Menninger with profound apathy, depression, and inertia. She had decreased appetite, decreased energy, difficulty concentrating, [and] feelings of worthlessness and hopelessness. She reported poor sleep in the days prior to admission and was beginning to experience paranoia. . . .
>
> It is my opinion that [M.P.] needed this level of care in order to provide her with the safety and security to openly address her difficulties. **Her profound depression was complicated by a serious substance abuse problem that increased the likelihood of a completed suicide**. **This very troubled young woman had significant mood problems that required a high level of structure and containment.** In my opinion, this treatment was medically necessary to prevent future harm to her. In my opinion, her treatment was appropriate in terms of type, duration, and level of care.

*Id.* (emphasis added). Another of M.P.'s treatment providers from Menninger, psychologist Dr. Shweta Sharma, also endorsed the length of treatment. *Id.* at 253 (BCBSTX5730). Dr. Sharma emphasized M.P.'s recent history of hospitalizations and suicide attempts, as well as her report of "minimal benefits from outpatient treatment." *Id.*

Upon completion of the IER, Dr. Girgis found that additional days of inpatient care were justified based on M.P.'s prior hospitalizations and recent suicide attempts. Specifically, he stated that M.P. "was still a danger to self because not only was there was a recent suicide attempt that had to be addressed but the member has shown a continued pattern of suicidal ideation, which needed to be addressed to prevent [her] from being a continued threat to self." Doc. 42, att. 2, p. 18 (BCBSTX0190). He also repeated the findings that M.P. had received "minimal benefits" from outpatient care in the past and that her stay at Menninger had "dramatically altered the course of illness in a way local hospitalizations were not able to do." *Id.* Nonetheless, he found that M.P. did not "meet the MCG criteria for continued treatment at a mental health inpatient program" beyond February 10, 2016, and that the remaining dates of services at Menninger were not "medically necessary or appropriate" for her treatment. *Id.*

M.P. presented at Menninger with test scores indicating severe depression and anxiety, impulsivity, poor well-being, and emotional dysregulation. Doc. 43, att. 2, pp. 43–46 (BCBSTX1084–7). At the time of admission, M.P. rated her desire to live as a 3 on a scale of 0-8 and her desire to die as a 6 on the same scale. *Id.* at 46 (BCBSTX1087). While M.P. showed mild to moderate improvement in some of her psychometric scores by February 10, her depression was still rated in the severe range by that date. *See id.* at 49–51 (BCBSTX1090–92). At that time she also rated both her desire to live and her desire to die as a 4 out of 8. *Id.* at 106 (BCBSTX1147). Menninger assessed M.P.'s "[d]anger to self/others" as having stabilized by February 2, 2016. Doc. 43, att. 10, p. 2 (BCBSTX3243). Over the next week, this state continued. *Id.* at 3–58 (BCBSTX3244–99).

M.P. displayed occasional episodes of irritability or blunted affect, but also reported an improving mood. *Id.* On February 9, M.P. was tearful and having difficulty adjusting to a new SSRI but denied any suicidal ideation or intent. Doc. 43, att. 8, pp. 70–71 (BCBSTX2702–03). The following day, M.P. appeared more engaged during her assessments. *Id.* at 73–77 (BCBSTX2705–09). She also reported improved mood and sleep. *Id.* Treatment notes show that her risk level at Menninger was downgraded from Level of Responsibility 1 to Level 2 by February 11, based on a request from February 9. *Id.* at 82 (BCBSTX2714). It was then downgraded from Level 2 to Level 3 (the lowest level) by February 17, 2016. Doc. 43, att. 2, p. 192 (BCBS1233). After this change her risk level remained the same until her discharge on March 21, 2016. *See* doc. 44, att. 1, pp. 292–95 (BCBSTX3859–61).

Based on the above, there was some evidence to support BCBSTX's implicit determination that M.P. no longer posed an "imminent risk" of suicide or self-harm by the last covered date and/or that a lower level of care might have been feasible. The question here, however, is whether that evidence amounted to a substantial amount in support of a denial of benefits.

Defendants assert that allowing M.P.'s history to guide the determination is ill-advised, because "under that reasoning, M.P. would remain in acute inpatient care for the rest of her life."[5] Doc. 150, p. 4. But they appear to forget that her inpatient care did

---

[5] Defendants also suggest that M.P. could always have returned to acute inpatient care if her condition worsened, in reliance on dicta in *Ariana M. v. Humana Health Plan of Texas, Inc.*, 2018 WL 4384162, at *16 (S.D. Tex. Sep. 14, 2018), *aff'd*, 792 F. App'x 287 (5th Cir. 2019). Doc. 150, p. 4. *Ariana M.* involved a patient with a history of eating disorders and self-harm, though not suicide attempts, challenging a determination that only outpatient care was appropriate after seven weeks of partial hospitalization. A "worsening" of condition necessitating M.P.'s return to

conclude less than six weeks later. M.P. then completed intensive outpatient treatment at Westend without returning to inpatient care. Furthermore, plaintiff represents that M.P. has improved dramatically since her treatment in 2016, with no further suicide attempts, and will soon be graduating college. Doc. 146, p. 8.

M.P.'s treatment providers at Menninger endorsed a longer stay, believing that her recurrent suicide attempts required acute inpatient care and could not be addressed through a short-term stay or lower level of care. M.P.'s evaluations from around the time of the last covered date showed only modest improvement and she was not downgraded to the lowest level of responsibility at her acute inpatient facility until February 17. While M.P. denied suicidal ideation and appeared to be adjusting well to the program, she was still severely depressed by the last covered date and expressed ambivalence on her desire to live or die.

The reviewers seem to have seized upon any indication that M.P. did not have active suicidal ideations as signifying an end to the risk that had justified her admission, even though (1) there were clear signs that she still relied on the restrictions of an inpatient setting, (2) she had attempted suicide again after several prior inpatient stays, (3) her treating providers did not believe she could stop her cycle of suicidal and self-harming behavior without a longer stay, and (4) her treating psychiatrist believed that she posed an increased risk of completing suicide based on her history and comorbid substance use disorder. While Dr. Girgis acknowledged some of these factors in his rationale for allowing an additional five days of coverage, neither he nor the record provides adequate

---

acute inpatient care could well be life-threatening. Any medical necessity finding in her case should not so easily rely on being shuffled between levels of care if the plan administrator's determination proved premature.

justification for cutting off coverage so far short of the recommended treatment. Instead, his decision to extend coverage for only five additional days stands in direct opposition to these risks and to his agreement that M.P.'s completed stay at Menninger had "dramatically altered the course of [her] illness" in a way previous treatment could not. Doc. 42, att. 2, p. 18 (BCBSTX0190). Accordingly, the evidence was insufficient to support a denial of benefits and the plan administrator's decision must be overturned.

### C. Requested Remedies

The parties agree that the amount unpaid under the denied claims is $37,136.36. Plaintiff also seeks an award of prejudgment interest and attorney fees, which defendants oppose. Both remedies are available, at the court's discretion, in ERISA cases. *See, e.g.*, *Tesch v. Prudential Ins. Co. of Am.*, 829 F.Supp.2d 483, 499–502 (W.D. La. 2011). Plaintiff requests that he be allowed to submit a supplemental brief on remedies. The court will grant that request and set a briefing schedule in the attached judgment.

## IV.
### CONCLUSION

For the reasons stated above, plaintiff's Motion for Summary Judgment [doc. 128] will be **GRANTED** and defendants' motion [doc. 138] will be **DENIED**. The issue of damages and remedies will be deferred for further briefing.

**THUS DONE AND SIGNED** in Chambers, on this 8th day of May, 2020.

**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**